**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RACHEL R. BALL,**

     **Plaintiff,**

                                 **Civil Action 2:20-cv-3691**

     **v.**                            **Judge Sarah D. Morrison**

                                   **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income benefits ("SSI"). This matter is before the undersigned for a Report and Recommendation ("R&R") on Plaintiff's Statement of Errors (ECF No. 19), the Commissioner's Memorandum in Opposition (ECF No. 20), and the administrative record (ECF No. 14). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's determination.

### I.      BACKGROUND

Plaintiff filed an application for SSI on August 20, 2014, alleging that she became disabled on April 29, 2005. (R. at 153.) Plaintiff's application was denied initially in December 2014, and upon reconsideration in May 2015. (R. at 78, 79–89, 90, 91–105.) A hearing was held on March 28, 2017, before an Administrative Law Judge ("ALJ"), who issued an unfavorable determination on August 2, 2017. (R. at 35–77, 12–31.) The Appeals Council declined to review that unfavorable determination, and thus, it became final. (R. at 1–6.)

Plaintiff sought judicial review of that determination in a case docketed in this Court as *Ball v. Commissioner of Social Security*, 2:18-cv-00376-MHW-EPD.  After the matter was remanded in that action, the ALJ held a second hearing on March 3, 2020, and issued a second unfavorable determination on March 24, 2020.  (R. at 1892–1938, 1862–91.)

In this action, Plaintiff seeks judicial review of the ALJ's second unfavorable determination.  She alleges a single assignment of error: the ALJ failed to properly weigh opinions contained in a neuropsychological evaluation performed in 2014 ("the 2014 evaluation").  Specifically, Plaintiff alleges that the ALJ erred by finding that the opinions in the 2014 evaluation were not entitled to controlling weight because the 2014 evaluation was performed by a non-acceptable medical source, ignoring that it had been co-signed, and thus adopted, by an acceptable medical source.  (ECF No. 19, at PageID # 2948.)  The undersigned concludes that Plaintiff's claim lacks merit.

## II.     THE ALJ's DECISION

The ALJ issued her decision on March 24, 2020, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 1862–1938.)  At step one of the sequential

evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since July 10, 2014, her application date.  (R. at 1868.)  At step two, the ALJ found that Plaintiff had the following severe impairments: coronary artery disease status-post stenting; status post-heart transplant with vasculopathy; obesity; idiopathic neuropathy; neurocognitive disorder; anxiety disorder; and depression.  (*Id.*)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

The ALJ then set forth Plaintiff's residual functional capacity ("RFC")[2] as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined 20 C.F.R. § 416.967(b) except that the claimant occasionally can climb ramps or

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
>
> 4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
>
> 5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[2] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations."  20 C.F.R. § 4040.1545(a)(1).

stairs, stoop, kneel, crouch, and crawl.  She can occasionally push, pull, and operate foot controls with the lower right extremity, including as necessary for occupational driving.  She can frequently balance.  She can never climb ladders, ropes, or scaffolds.  She should not work around hazards unprotected heights or work in proximity to exposed moving mechanical parts.  She cannot work in temperature extremes, humidity, wetness, vibration and atmospheric conditions as those are defined and rated in the *Selected Characteristics of Occupations* (SCO).  From a mental standpoint, the claimant can perform simple, routine, repetitive short-cycle tasks at an average pace, without strict time or production demands.  She can adapt to relatively static set of tasks where changes are explained and demonstrated and do not require reliance only on written instructions.  Tasks should not require more than simple written work product.  She can interact constantly with others on matters limited to the straightforward exchange of information, without negotiation, persuasion, or conflict resolution.  She would require oversight or redirection from a lead worker or supervisor one to two times in an eight hour shift for five to ten times total.

(R. at 1970–71.)  When assessing Plaintiff's RFC, the ALJ found that although her medically determinable impairments could be expected to cause at least some of her alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record evidence.  (R. at 1872.)  The ALJ also analyzed medical opinion evidence and gave partial weight to opinions in the 2014 evaluation, from a consultative examining psychologist, and from state agency medical reviewers; significant but not dispositive weight to opinions from a medical expert, Dr. Andert, who testified at the second hearing in March 2020; and less weight to opinions from a medical expert who testified at the first hearing in March 2017.  (R. at 1876–78, 1878–79, 1881–82, 1880–81, 1881.)

At step four, the ALJ found that Plaintiff has no past relevant work.  (R. at 1882.)  At step five, the ALJ relied on testimony from a Vocational Expert ("VE") to determine that in light of Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that she could perform.  (R. at 1883.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 1883–84.)

### III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.    ANALYSIS

As set forth previously, Plaintiff alleges that the ALJ erred by finding that the opinions in the 2014 evaluation were not entitled to controlling weight because the 2014 evaluation was performed by a non-acceptable medical source, Amery Treble-Barna, MA, a psychology intern, even though it was co-signed by an acceptable medical source, Jennifer Cass, Ph.D.  (ECF No. 19, at PageID # 2948.)  Plaintiff urges that there is no difference between opinions filled out by treating physicians and those opined by non-acceptable medical sources that are then signed, and thus adopted, by treating physicians.  (*Id*.)  The Commissioner asserts that the ALJ noted that the 2014 evaluation was cosigned by Dr. Cass, but further found that Dr. Cass was not a treating physician because the evaluation team performed an assessment and did not provide Plaintiff with long-term care or treatment.  (ECF No. 20, at PageID # 2962.)  The Commissioner is correct.

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c).[3]  The applicable regulations define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis."  20 C.F.R. § 416.927(a)(1).  "Acceptable medical source" is further defined via specific enumeration of five such sources.  20 C.F.R. § 404.1502 ("Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments."); § 404.1513(a) ("acceptable medical source" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists).

---

[3] Plaintiff's application was filed on August 20, 2014.  (R. at 153.)  Accordingly, it is governed by regulations applicable to claims filed prior to March 27, 2017.

The relationship between the source of a medical opinion and a claimant "dictates the process by which the Commissioner accords it weight." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") has explained as follows:

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"), *id.* § 404.1502, 404.1527(c)(2). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Id.*, at 375.

For claims like Plaintiff's, which was filed prior to March 27, 2017, a treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. An ALJ generally gives deference to opinions from a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If an ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id.*  In addition, the regulations provide that where an ALJ does not assign controlling weight to a treating physician, he or she must explain the weight assigned to the opinions of the medical sources. 20 C.F.R. § 416.927(c).  Specifically, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." *Id*.  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted).  The Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision).

Regardless of the source, when weighing a medical opinion, the ALJ must apply the

factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and the

specialization of the source.  20 C.F.R. § 416.927(c).  But the "good reason" requirement does

not apply where a medical source has not treated the claimant.  *See Ealy v. Comm'r of Soc. Sec.*,

594 F.3d 504, 514 (6th Cir. 2010).

In this case, the ALJ summarized the 2014 evaluation in detail.  She wrote:

> Since the current application (the applicable period under review), the claimant
> underwent a neuropsychological evaluation in April 2014, following
> hospitalizations for rejection as noted above.  The source reviewed the prior 2000
> neuropsychological evaluation as well as hospital record, interviews and
> questionnaires from the claimant and her father, as well as various tests, including
> the WAIS-IV, WASI-II, WRAT-IV, and language evaluation, memory testing, and
> behavior assessments.  The source noted a history of special education following
> the 2000 brain injury.  She had an IEP that included modified classes and individual
> instructions.  However, she was on the honor roll and graduated high school in
> 2005.  The claimant also attended college for six months.  The claimant reported
> mood difficulties as well as psychosocial stressors at that time.  She endorsed
> anxiety.  She reported having two close friends but spent most of her time with
> family.  She had a two-year old son.  She enjoyed gardening, painting, writing
> children's books, and making jerky.  The claimant was tested on three occasions,
> two during hospitalization and once as an outpatient.  During inpatient testing the
> claimant had difficulty concentrating, appeared drowsy, and fell asleep during both
> sessions.  However, during the outpatient evaluation, the claimant was pleasant and
> friendly.  She interacted appropriately.  She appeared slightly anxious but
> cooperative and motivated.  Her speech was clearly articulated and intelligible.  She
> was able to write legibly.  On general cognitive ability, the claimant's overall
> cognitive ability was slightly improved relative to the prior 2000 examination.
> Overall, cognitive ability was in the low-average range on the WAIS-II with a full

scale IQ of 82. Memory testing was unchanged, with impaired verbal learning and memory, below average total recall, and below average recognition. She had below average immediate and delayed recall on testing. As to executive function, the claimant's focused attention and problem solving skills improved. She remained impaired in processing speed, working memory, and cognitive flexibility. The claimant's word recognition was below average on the WRAT-IV. Her adaptive functioning was in the average to high-average range (which, I note, is not consistent with Dr. Andert's opinion regarding marked limits in adapting/managing). Moreover, she reported only mild symptoms of anxiety. The evaluation overall indicated low-average cognitive ability. The profile highlighted deficits in verbal and nonverbal skills, verbal learning and memory, processing speed, working memory, and complex psychomotor speed. Overall, the claimant showed relative recovery in several cognitive skills since the initial injury desoite some ongoing neuropsychological impairment. The source noted generalize impairment consistent with relatively diffuse brain disfunction stemming from the brain injury.

In the recommendations, the source noted that the claimant was at risk for academic, vocational, and adaptive difficulties. She might have difficulty acquiring new skills, performing skills independently, learning and recalling new information, and communicating her understanding. She might have difficulty getting started on tasks and completing work in a systematic, efficient manner. Her slower processing speed would interfere with completing tasks efficiently. The claimant was also at increased risk for adjustment difficulties and might experience increased frustration or decline in motivation. She nonetheless had strengths in functioning as well. She was noted to be a hard worker when provided with a structured work environment. Expectations should be in line with cognitive abilities, e.g., learning at a slower pace than peers. She would learn new information and skills best with review, practice, and reinforcement. The claimant would function best in a consistent, highly structured work environment where she had an individual or supervisor/mentor able to monitor performance and offer support. She would benefit from cues and ongoing monitoring to ensure tasks [*sic*] completion, remained focuses [*sic*], and attend to relevant information. She would benefit from concrete verbal explanations. Generalization of skills should be accomplished through direct instruction. Due to memory difficulties she would benefit from external prompts, such as verbal reminders, calendars, or visual schedules. She would benefit from repetition and review of information. She would benefit from drills and practice to learn new concepts or materials before tasks demands increased. She would retrieve information better with cues to assist with recall. The source noted that without some level of support, she might have difficulty maintaining employment. The evaluator was Amery Treble-Barna, an MA and psychology intern, and the evaluation was cosigned by Dr. Jennifer Cass, Ph.D. It does not appear that Dr. Cass was involved in the interview or evaluation processes, however, and the examination and testing were administered solely by the psychology intern, Amery Treble-Barna (Exhibit 2F; see also Exhibit 3F, 4F). Dr. Cass appears to have co-signed the evaluation as a supervisory psychologist.

(R. at 1876–77.)

The ALJ then explained in detail why she gave the opinions in the 2014 evaluation partial

weight.  She wrote:

> I give this assessment partial weight.  As noted by the impartial medical expert, Dr.
> Andert, the 2000 evaluation was immediately after the anoxic brain injury and
> while the claimant was still a child.  This 2014 assessment showed improvement in
> overall cognitive function despite ongoing neuropsychological limitations.  The
> claimant showed deficits, particularly in memory but not to an extent consistent
> with total disability.  The evaluation was performed in order to obtain information
> and advise the claimant and parents as to what treatment, intervention, and skills
> would help the claimant pursue education or work training.  It was not specifically
> performed to provide work-related functional limitations.  However, despite this, I
> have considered the noted areas of limitation as well as the various interventions
> recommended following the evaluation, as analyzed above.  I do not adopt all the
> noted interventions, such as external prompts, practice and repetition, external cues,
> or highly structured environment.  I note that these interventions were
> recommended without any assumed restriction on task complexity.  Given the
> claimants [*sic*] low average cognition overall, I have limited the complexity of tasks
> to simple, routine, repetitive, and short-cycle tasks, as well as limiting pace and
> production demands, to accommodate the claimant's memory deficits and slower
> processing speeds.  Given these limits the other supports would not be expected to
> be required for a person of low average cognition, despite some below average (but
> not low or very low) findings in other areas.  The limitation to static work with
> changes explained and demonstrated further accommodate the claimant's difficulty
> with learning new information and memory deficits.  The undersigned precluded
> negotiation, persuasion, or conflict resolution, which accommodated difficulty with
> frustration tolerance as well, in combination with the other limitations.  I have also
> incorporated the need for additional oversight or redirection in the workplace,
> which offers greater support for the claimant to complete duties and stay on task.
> These limitation adequately accommodate the claimant's cognitive impairment.  It
> is further noted that the claimant's daily activities support greater functioning than
> suggested by the evaluation conclusions.  For example, the claimant was able to
> drive without limitation.  She is the sole caretaker of her young son.  She worked
> with case management on complex issues with improvement in organizational
> abilities and self-sufficiency noted.  The claimant also worked cleaning houses
> without mental limitations noted.  I also took into account that she was seen by
> these evaluators for assessment and not longer term care or treatment.  While the
> reports were cosigned by a psychologist, the individual performing the analysis was
> not an acceptable medical source.  The co-signing psychologist does not meet the
> definition of a "treating source" whose opinions may be given "controlling weight."
> However, even if Dr. Cass qualified under rules as a treating source, these opinions
> are not entitled to controlling weight because they are not supported by or consistent
> with other substantial evidence in the record, as discussed herein.  This includes,

but is not limited to, the opinions of Dr. Andert, who had access not only to the findings of this two day evaluation but the balance of evidence in the file. Accordingly, I give this assessment partial weight.

(R. at 1877–78) (emphasis added).

Plaintiff contends that the ALJ mistakenly determined that the opinions in the 2014 evaluation were not entitled to controlling weight because the 2014 evaluation was performed by Ms. Treble-Barna, a non-acceptable medical source. (ECF No. 19, at PageID # 2948.) But that mischaracterizes the ALJ's determination. As the excerpt above demonstrates, the ALJ noted that the 2014 evaluation was done by Ms. Treble and that it was signed off by Dr. Cass. (R. at 1878.) But the ALJ also explicitly found that the 2014 evaluation was done for assessment purposes and that the co-signing psychologist, Dr. Cass, was not a treating source whose opinions were entitled to the controlling-weight analysis. (*Id*.) Therefore, the opinions in the 2014 evaluation were not entitled to controlling weight even if Dr. Cass signed, and thereby adopted them.

The undersigned finds that the ALJ did not err when determining that Dr. Cass was not a treating source. "A physician qualifies as a treating source if there is an 'ongoing treatment relationship' such that the claimant sees the physician 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1527(c)(2)). A Court must determine if an ongoing treatment relationship exists at the time the physician's opinion is rendered. *Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 F. App'x 496, 506 (6th Cir. Feb. 9, 2006). In this case, the record does not reflect that the evaluators had an ongoing relationship with Plaintiff. The record reflects that the evaluators tested Plaintiff a total of three times. (R. at 230.) In addition, it appears that the third day of

testing was required only because Plaintiff fell asleep during the first two testing dates. (*Id*.) Courts have frequently found that a handful of visits did not suffice to establish an ongoing relationship. *See, e.g.*, *Kornecky*, 167 F. App'x at 506 (quoting *Cunningham v. Shalala*, 880 F. Supp. 537, 551 (N.D. Ill. 1995) ("[W]here a physician saw claimant five times in two years, it was 'hardly a foregone conclusion' that his opinion should be afforded great weight.")); *Downs v. Comm'r of Soc. Sec.*, 634 F. App'x 551, 556 n.2 (6th Cir. 2016) (noting that "the handful of visits [the plaintiff] had with Dr. Murphy do not necessarily render Dr. Murphy a 'treating source' with an 'ongoing relationship' with [the plaintiff]"); *Helm v. Comm'r of Soc. Sec.,* 405 F. App'x 997, 1000 n.3 (6th Cir. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source—as opposed to a nontreating (but examining) source."); *Yamin v. Comm'r of Soc. Sec.,* 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition."); *Boucher v. Apfel,* No. 99–1906, 2000 WL 1769520, at *9 (6th Cir. Nov. 15, 2000) (finding that a doctor was "not a treating source" even though the doctor had examined the claimant three times over a two-year period).

Moreover, the 2014 evaluation indicates that Plaintiff was referred to the evaluators for a "repeat neuropsychological evaluation" "to document her neuropsychological functioning and to assist with clinical management." (*Id*.) But the record is bereft of any evidence that Plaintiff ever received treatment or care from the evaluators. Indeed, Plaintiff has not submitted any treatment notes from the evaluators. *See Francis v. Comm'r. of Soc. Sec.*, No. 2:17-cv-1022, 2018 WL 4442596, at * 8 (S.D. Ohio Sept. 18, 2018), ("To the extent other records exist that would establish a treating relationship, it was Plaintiff's burden to supply those records."), *report and recommendation aff'd*, 2018 WL 4932081, (S.D. Ohio Oct. 11, 2018).

Plaintiff cites cases concluding that there is no difference between opinions from treating sources and those opined by other sources that are then signed and adopted by treating sources. (ECF No. 19, at PageID # 2948–49.)  In those cases, however, treating sources ultimately signed and adopted opinions.  *See e.g.*, *Fairchild v. Colvin*, 14 F. Supp. 3d 908, 917 n.5 (S.D. Ohio 2014) (plaintiff's treating psychiatrist signed statements made by plaintiff's social worker); *Loukinas v. Comm'r of Soc. Sec.*, No. 1:14-cv-930, 2016 WL1126550, at *12 (S.D. Ohio Mar. 21, 2016) (plaintiff's treating psychiatrist signed a medical questionnaire); *Robinson v. Comm'r of Soc. Sec.*, No.2:14-cv-01682, 2015 WL 5768483, at *3 (S.D. Ohio Sept. 30, 2015) (plaintiff's treating psychiatrist signed assessment completed by plaintiff's social worker).  In this case, the 2014 evaluation was signed by Dr. Cass, but Dr. Cass was not a treating source.  Thus, these cases are inapposite.

Because the opinions in the 2014 evaluation were not from a treating source, the ALJ was not required to determine if they were entitled to controlling weight or provide good reasons for declining to give them controlling weight.  Instead, the ALJ was required to consider the relevant factors, including supportability, consistency, and specialization when analyzing them.  20 C.F.R. § 404.1527(d)(2).  The ALJ satisfied that requirement by determining that the limitations opined in the 2014 evaluation were not consistent with or supported by other record evidence. Specifically, the ALJ concluded that Plaintiff's daily activities "supported greater functioning than suggested by the evaluation conclusions."  (R. at 1877.)

Substantial evidence supports the ALJ's determination that Plaintiff's daily activities were inconsistent with the limitations opined in the 2014 evaluation.  In January 2015, Plaintiff reported that she was able to care for her child.  (R. at 778.)  In August 2015, Plaintiff reported that she was living independently and that she had a good activity level.  (R. at 1579.)  In

November 2015, Plaintiff reported that she had taken a cruise with family members to Jamaica, Hawaii, and Mexico and that she lived "autonomously" but filled her pillboxes with help from her father. (R. at 1599.) In December 2016, Plaintiff reported chest pain when running after her son but that she had no pain when walking and that she was walking three miles a day. (R. at 1659.) In September 2017, Plaintiff reported that she cleaned houses for money. (R. at 2335.) In January 2018, Plaintiff reported that her occupation was housecleaner. (R. at 2342.) In May 2018, Plaintiff indicated that she was "able to be active in her job cleaning houses, and chasing after her child." (R. at 2354.) In July 2018, Plaintiff reported that she was "overall feeling well, active with work (cleaing homes) and young son;" she could "work about 2.5 hours before stopping;" and she was "walking on a treadmill daily for up to 20 minutes." (R. at 2719.) Records from that visit also state that Plaintiff was "clinically minimally symptomatic" and that she was highly active. (R. at 2722.) In September 2018, Plaintiff's current level of activity included the ability to walk briskly and climb two flights of stairs. (R. at 2834.) In October 2018, Plaintiff reported that she continued to clean houses for money and that she was not currently exercising but planned to start soon. (R. at 2366.) She also lived independently in an apartment with her son, although she had help with bills from a "social lady" and help from her father who filled her medication boxes weekly. (*Id*.) In January 2019, Plaintiff again reported that she worked cleaning homes and that she planned to go to the gym a couple days a week. (R. at 2771.) Later that same month, Plaintiff reported that she worked 2-3 days a week cleaning houses and that she went to the gym "sometimes" but planned to go more. (R. at 2775.) In June 2019, Plaintiff reported that she had a gym membership and that she had started working out again. (R. at 2680.) In August 2019, Plaintiff discussed daycare issues associated with her work schedule. (R. at 2508.) That same month, Plaintiff reported that it was not practical for her to

use a menthol foot cream that she had been prescribed because she was currently working

cleaning houses.  (R. at 2732.)

In summary, the undersigned finds that the ALJ did not commit reversible error when

considering and analyzing the opinions in the 2014 evaluation.

## VI.    RECOMMENDED DISPOSITION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the

Commissioner's non-disability determination.

## VII.    PROCEDURE ON OBJECTIONS

If any party objects to this R&R, that party may, within fourteen (14) days of the date of

this R&R, file and serve on all parties written objections to those specific proposed findings or

recommendations to which objection is made, together with supporting authority for the

objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions

of the R&R or specified proposed findings or recommendations to which objection is made.

Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or

in part, the findings or recommendations made herein, may receive further evidence or may

recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the R&R will result in a

waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a

waiver of the right to appeal the decision of the District Court adopting the R&R.  *See Thomas v.

Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*___
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE